RSTEVEN G. KALAR
Federal Public Defender
Northern District of California
DAVID RIZK
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
Email:        David_Rizk@fd.org

Counsel for Defendant IRIAS-LOBO

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SANTOS IRIAS-LOBO,<br><br>Defendant. | **Case No.:** CR 19–00646 EMC<br><br>**DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE**<br><br>**Hearing Date:**   September 30, 2020<br>**Hearing Time:**   9:00 a.m. |

**I.      INTRODUCTION**

Defendant Santos Irias-Lobo will be before the Court on September 30, 2020 to be sentenced in this Tenderloin case. Mr. Irias-Lobo was driven to the United States by dire poverty in Honduras. He had been in the United States off and on for six years when he was arrested, and is father to an infant daughter, who is a U.S. citizen, with his partner, who is also a U.S. citizen. Since his release in this case and initial appearance in December 2019, Mr. Irias-Lobo has been living in a small apartment with his partner and taking care of their child. Mr. Irias-Lobo has an active ICE detainer, and thus after his sentence, he will be deported. He understands that he must not attempt to return to the United States. He respectfully asks that he be sentenced to time served and three years of supervised

release. A harsher sanction is not necessary. Permanent separation from Mr. Irias-Lobo's infant daughter and her mother is the harshest punishment that could befall a father. Furthermore, the fact of the aggravated felony conviction, which is in effect a lifetime ban from the United States, and the overall gravity of this case, has already sent a message—one that he has heard. Although the government dwells on Mr. Irias-Lobo's prior conviction, and his three prior arrests for drugs, the fact is that once this case was instituted, his conduct changed dramatically. He has had no pretrial issues whatsoever, has abided by the Tenderloin stay-away order, and has not touched narcotics. Instead, he has been focused on supporting his family and caring for his baby girl.

## II.     SENTENCING GUIDELINES

Mr. Irias-Lobo stipulates to the sentencing calculation set forth in his plea agreement:

Base Offense Level, U.S.S.G. § 2D1.1(c)(13):                                    14

Acceptance of responsibility, U.S.S.G. § 3E1.1:                                  -2

**Total Offense Level                                                              12**

Mr. Irias-Lobo agrees with the Presentence Report (PSR) receives four criminal history points and thus falls into Criminal History Category III. The Guideline sentence for a Total Offense Level of 12 and Criminal History Category III is 15-21 months.

## III.    FACTUAL BACKGROUND

Mr. Irias-Lobo was born on February 28, 1990 in the town of San Ignacio, Francisco Morazán, Honduras, to Eleodoro Sandoval and Rosa Ermelinda Irias-Lobo. PSR ¶ 37. He has two siblings, both of whom also live in the United States. *Id.* Mr. Irias-Lobo remains close to his family. *Id.* Mr. Irias-Lobo was raised by his mother. *Id.* ¶ 38. His father left shortly after his mother became pregnant. *Id.* Mr. Irias-Lobo did not meet his father until he was approximately six years old and saw him infrequently thereafter during his childhood. *Id.* Later in life, Mr. Irias-Lobo became closer with his father after he fell ill and eventually passed away seven years ago. *Id.* ¶ 39.

Mr. Sandoval did not support his family financially or otherwise—instead, that fell to Ms. Irias-Lobo. *Id.* ¶ 38. She worked "very hard" (Mr. Irias-Lobo's words) as a domestic worker for wealthier families, according to Mr. Irias-Lobo. *Id.* Their own family lived in extreme poverty in a small house without running water. *Id.* He reports that his family was so poor that, as a child, he did not have time

for the activities that most children enjoy. *Id.* ¶ 39. He had a few friends but no time for sports or socializing. *Id.* Mr. Irias-Lobo attended school for approximately 5 years before joining his siblings to work to support the family. *Id.* ¶ 38. Mr. Irias-Lobo enjoyed school—and would return now if he could—but had no choice. His older brother was forced to leave school even earlier, at around age 14. *Id.* Mr. Irias-Lobo reports that the children in his family had to work from a young age because their mother was exhausted. *Id.* Mr. Irias-Lobo worked from the age of 15 in the fields, picking corn and beans for seven hours a day or more, but earning only about 40 lempiras ($1.62) per day. *Id.* As the Court is likely aware: "Honduras is one of the poorest countries in Latin America. Two-thirds of its roughly 9 million people live in poverty, according to the World Bank, and in rural areas, 1 in 5 lives in extreme poverty."[1] Mr. Irias-Lobo was among those living in "extreme poverty," i.e., on less than $2 per day.[2]

Mr. Irias-Lobo's older brother came first to the United States to seek better employment, given the disastrous conditions in Honduras. PSR ¶ 38. Mr. Irias-Lobo followed him in 2013, also in an effort to financially support his mother. He travelled to the United States via a freight train, notoriously known as "La Bestia" or The Beast, because it maims or injures migrants who fall off.[3] Beyond the risk of falling, migrants are vulnerable to the gangs and organized-crime groups that control the routes, which extort and victimize the migrants.[4] Mr. Irias-Lobo suffered considerably during the trip. He witnessed migrants get sick and die along the way. After his first trip to the United States in 2013, Mr. Irias-Lobo quickly got sick and had to return to Honduras. PSR ¶ 38. During a

---

[1] "Why People Flee Honduras: Immigrants at the U.S.-Mexico border are hoping to leave behind a home devastated by poverty, gangs, and crime, and widespread violence against women," POLITICO Magazine, June 7, 2019, *available at* https://www.politico.com/magazine/story/2019/06/07/honduras-why-people-flee-photos-227087 (last accessed Sept. 23, 2020).
[2] World Bank - The World Bank in Honduras ("In rural areas, approximately one out of 5 Hondurans live in extreme poverty, or on less than US$1.90 per day."), *available at* https://www.worldbank.org/en/country/honduras (last accessed Sept. 23, 2020).
[3] "Migrants riding La Bestia are likely to be some of the poorest, as the costs of riding the train (bribes, gang tariffs, etc.) still are cheaper than paying a smuggler to organize and facilitate the journey." *See* Rodrigo Dominguez Villegas, Migration Policy Institute, *Central American Migrants and "La Bestia": The Route, Dangers, and Government Responses*, Sept. 10, 2014, *available at* https://www.migrationpolicy.org/article/central-american-migrants-and-"la-bestia"-route-dangers-and-government-responses (last accessed September 23, 2020).
[4] *Id.*

second attempt to enter the United States, he was promptly removed in the border zone. *Id.* ¶ 30. He returned in 2018 to find work in the Bay Area doing construction—first, painting, then sheet rock. *Id.* ¶¶ 38, 47. Because it was difficult to find regular work, regretfully, Mr. Irias-Lobo resorted to selling drugs. *Id.*

Mr. Irias-Lobo met his partner Sierra Guevara at a restaurant approximately two years ago, and they have been together ever since. *Id.* ¶ 40. As noted, they have an infant daughter together. *Id.* Ms. Guevara and Mr. Irias-Lobo were devastated to learn that his conviction would almost certainly be followed by deportation. Ms. Guevara has attended every court appearance with their daughter and signed Mr. Irias-Lobo's bond. She remains supportive of him. *Id.* Mr. Irias-Lobo has a strong connection with their young daughter, that has strengthened over the last year. *Id.* The family photographs and letters addressed to the Court are testament to the connection between Mr. Irias-Lobo, Ms. Guevara, and their baby girl. *See* Rizk Decl., Exs. A-B. Although Mr. Irias-Lobo also has family in Honduras with whom he remains very close and supports financially, PSR ¶ 40, his deportation will be a significant hardship for everyone involved. Mr. Irias-Lobo feels terribly about his offense and how it has impacted all of his family in both countries. *Id.* ¶ 40.

## IV. LEGAL STANDARD

The Court is familiar with the directives of *United States v. Booker*, 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a). The Sentencing Guidelines range is not mandatory and the Court has a duty to exercise judgment and discretion in arriving at an appropriate sentence. Importantly, the Court may not presume the Guidelines range is reasonable. *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam). Instead, the Court must consider the Guidelines range, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentence disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(1), (a)(4) and (a)(6). In crafting a sentence that is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a), the Court must also consider the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed

educational and vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

## IV.     ARGUMENT

Several matters warrant the Court's consideration in connection with Mr. Irias-Lobo's request for a time served sentence and the § 3553(a) factors:

*First*, the charged offense and Mr. Irias-Lobo's current circumstances counsel in favor of a time served sentence. This case should not have been prosecuted federally. The offense was a street-level drug sale that did not involve violence, weapons, possession of large quantities of controlled substances, or other aggravating factors. Mr. Irias-Lobo had minimal education and no meaningful vocational opportunities. In fact, Mr. Irias-Lobo is a refugee from poverty and gang violence in Honduras who sought economic opportunities in the United States. Mr. Irias-Lobo has one prior conviction (for accessory under P.C. 32) and three prior drug arrests (none of which led to a conviction). Although the government is at pains to present this past as aggravating, it is hardly the type of background that would ordinarily lead to federal indictment. The longest, and only, sentence that Mr. Irias-Lobo has ever received is 95 days in custody, of which he served just a fraction.

The reality is that the local criminal justice system was working in the way that this community prefers—certainly as compared to this U.S. Attorney's Office's penchant for over-incarceration. Notwithstanding his disappointing arrest in this case, which was motived by poverty, Mr. Irias-Lobo was and is, according to his S.F. Adult Probation officer, otherwise in compliance with all the terms of his state probation and before his arrest had recently started participating in Citywide Case Management, an innovative program at U.C. San Francisco that is designed to assist clients in changing their mindset. PSR ¶ 24. In contrast to these more successful diversion programs available to state defendants, federal prosecutions such as this one inappropriately single out impoverished immigrants in our community where the gravity of the crime simply does not warrant the use of federal resources, let alone a 15-month sentence. Thus, given the circumstances of the offense, additional custodial time is certainly not necessary to mete out sufficient punishment, consistent with the mandate of § 3553(a).

*Second*, deterrence does not justify a longer sentence. As an initial matter, the available data

does not support the conclusion that longer sentences promote general deterrence.[5] Given the particular the circumstances of this case, specific deterrence also does not require a custodial sentence here. As an initial matter, there are larger structural incentives that undermine the specific deterrent value of a longer sentence—namely, Mr. Irias-Lobo's extreme poverty, and the terrible conditions in Honduras. The hardships at home drove him to take the extraordinary and unwelcome steps of fleeing his family and his country, and ultimately to commit the instant crime. Mr. Irias-Lobo took these steps in order to survive. The deterrent value of a marginally longer sentence, weighed against the desperation felt by immigrants such as Mr. Irias-Lobo, is doubtful at best. Moreover, and again, 95 days is the longest sentence Mr. Irias-Lobo has ever received. A 15-month sentence is grossly disproportional to the gravity of the crime in this case and would represent an over-escalation of punishment. Finally, Mr. Irias-Lobo's recent behavior indicates that he has already been completely deterred. As Probation notes: "Mr. Irias-Lobo has performed well on pretrial release and is compliant with his term of county probation. He is focused on raising his baby daughter and working when possible." PSR (Sentencing Recommendation) at 2.

*Third*, public safety certainly does not mandate a longer sentence for many of the same reasons. Mr. Irias-Lobo has ceased all anti-social behavior. He is not violent, he is not a leader or organizer, he does not belong to a gang, and he had no personal stake in any selling operation. Although the government has attempted justify its misguided campaign of low-level drug prosecutions in the Tenderloin by citing statistics concerning substance abuse and deaths in the area in many of these cases, there is no evidence that prosecutions of the lowest level offenders will have any appreciable impact on public health and safety given the supply of desperate migrants in Central America.

*Fourth*, Mr. Irias-Lobo's request for a downward variance that would permit him to avoid further time in custody comes during an unprecedented public health emergency. As of now, there have been 20,680 coronavirus cases in Alameda County and 395 deaths.[6] At Santa Rita Jail,

---

[5] *See, e.g.,* Kelli D. Tomlinson, *An Examination of Deterrence Theory: Where Do We Stand?* FEDERAL PROBATION 80 (3), 33-38 (Dec. 2016) ("Severity of punishment was once thought to deliver the main deterrent effect; the more severe the consequence for law-breaking, the less likely an individual is to commit a crime. However, this assumption has not been supported in the literature.").
[6] *Coronavirus in California: Map and Case Count*, The New York Times (September 23, 2020), *at*

DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE
*IRIAS-LOBO*, CR 19–00646 EMC

according to the Sheriff, there are currently 17 known cases, and 70 pending tests.[7] To date, there have been approximately 298 cases at the jail. *Id.* Numerous units (with an unknown number of individuals) and dozens of inmates showing symptoms are currently quarantined due to exposure to the virus. *Id.* Conditions at Santa Rita Jail are, as the Court is no doubt aware, much worse than usual. Inmates are in tight quarters; most units have dozens of inmates living together, with two inmates to a cell. Access to personal hygiene items is limited for those who do not have funds to use at the commissary. While the jail has provided each inmate with a mask and one additional bar of soap, it is hardly enough to protect the population. Additionally, the jail has now restricted all visits. All programming has been discontinued. Inmates are extremely anxious, and many are trying to stay in their cells to avoid contact. Moreover, after any sentence, Mr. Irias-Lobo may be arrested and held at an ICE facility prior to his deportation. Several judges on this Court have already started granting temporary restraining orders to release ICE detainees at Yuba County Jail due to poor conditions and health risks to the detainees.[8] In view of all this, and given the necessity of depopulating the jail to the maximum extent possible in the interest of public health, Mr. Irias-Lobo respectfully asks the Court to consider a downward variance to time served.

*Fifth*, and finally, Mr. Irias-Lobo submits that the need to avoid sentencing disparities counsels in favor of a time served sentence. *See* 18 U.S.C. § 3553(a)(6) (sentencing court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). As the Court knows, over 150 defendants have been targeted by the U.S. Attorney's Office's Federal Initiative for the Tenderloin (FIT),[9] and dozens have been

---

https://www.nytimes.com/interactive/2020/us/california-coronavirus-cases.html (updated regularly).
[7] Alameda County Sheriff, COVID-19 Update (September 23, 2020) *at* https://www.alamedacountysheriff.org/admin_covid19.php.
[8] *See, e.g., John Doe v. Barr*, No. 20-CV-02141 LB, ECF No. 27 at 10-11 (N.D. Cal. Apr. 12, 2020) (order describing conditions of confinement at Yuba and granting release); *see also Bahena Ortuno, et al., v. Jennings, et al.,* No. 20-CV-02064 MMC, ECF No. 38 (N.D. Cal. Apr. 8, 2020) (order granting release).
[9] U.S. Attorney's Office, Northern District of California, Federal Initiative for the Tenderloin ("As of March 2020, more than 150 defendants have been publicly charged as part of FIT."), *available at* https://www.justice.gov/usao-ndca/federal-initiative-tenderloin (September 23, 2020).

DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE
*IRIAS-LOBO*, CR 19–00646 EMC

given time served sentences in very similar drug cases.[10] Thus, for the sake of equity and consistency with other similar FIT cases, the Court should impose a time served sentence.

### V. CONCLUSION

For all the reasons set forth above, Mr. Irias-Lobo respectfully asks that the Court sentence him to time served followed by three years supervised release.

Dated: September 23, 2020

Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender
Northern District of California

/S
DAVID RIZK
Assistant Federal Public Defender

---

[10] *See, e.g., United States v. Arteaga,* 19-cr-426 WHO (time served); *United States v. Varela-Ramos,* 19-cr-713 EMC (time served); *United States v. Servellon,* 19-cr-689 RS (time served).